UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

HARRIET ANTHONY,           )
                           )
            Plaintiff,     )
                           )
       v.                  )        No. 4:11 CV 942 SNLJ/DDN
                           )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security  )
                           )
            Defendant.     )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final
decision of defendant Commissioner of Social Security denying the
application of plaintiff Harriet Anthony for disability insurance
benefits under Title II of the Social Security Act (the Act), 42 U.S.C.
§ 423, and for supplemental security income under Title XVI of that Act,
§ 1382. The action was referred to the undersigned United States
Magistrate Judge for review and a recommended disposition under 28 U.S.C.
§ 636(b). For the reasons set forth below, the undersigned recommends
that the ALJ's decision be affirmed.

**I. BACKGROUND**

Plaintiff Harriet Anthony, who was born in October 7, 1951, filed
applications for Title II and Title XVI benefits on December 31, 2007.
(Tr. 66.) She alleged a disability onset date of April 27, 2007, due to
a back injury from a fall at work on February 6, 2007, a torn rotator
cuff, carpal tunnel syndrome, and high blood pressure. (Tr. 23, 137.) Her
applications were denied initially on March 5, 2008, and she requested
a hearing before an ALJ.[1] (Tr. 69-73, 74-75.)

---

[1]Missouri is one of several test states participating in
modifications to the disability determination procedures which apply in
this case. 20 C.F.R. §§ 404.906, 404.966 (2007). These modifications
include, among other things, the elimination of the reconsideration step.
See id.

Following a hearing held on August 31, 2009, on November 10, 2009, the ALJ found plaintiff was not disabled. (Tr. 21-27.)   On April 19, 2011, the Appeals Council denied her request for review.   (Tr. 1-4.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. (Tr. 1.)

## II.  MEDICAL HISTORY

On February 6, 2007, Anthony sustained injures at work from a slip and fall off of a two-step stepladder onto a concrete floor, and was examined at Barnes Care. (Tr. 237.) She was ordered to physical therapy and was advised not to lift more than ten pounds. (Tr. 240.) The next day she was seen at SSM DePaul emergency room for complaints of continued lower back pain and tailbone pain from the same injury. She rated her pain at 7/10. (Tr. 196.) She was diagnosed primarily with a lumbar sprain and additionally with a coccyx contusion. (Tr. 197.)

Anthony began physical therapy on February 9, 2007, and was discharged on February 21, 2007. During her time in physical therapy, there were noted improvements in lumbar range of motion (ROM). Her extension remained at twenty degrees, but forward flex improved from forty to forty-five degrees, right and left rotation increased from five to ten degrees, and right and left sidebending increased from twenty degrees to twenty to twenty-five degrees. At the end of physical therapy, she was noted to have "normal improved even steps" and good balance, improving from fair. Her pain was 10/10 upon entry, and 6/10 upon discharge. Her extremity strength remained 4/5 all categories. (Tr. 291.)

Anthony had two follow-ups after her initial emergency room visits. The first was on February 16, 2007. (Tr. 222.) Although she was advised on February 6 to not lift more than ten pounds, she continued working full duty between the time of injury and February 16 because the kitchen where she worked had only one cook scheduled per shift. (Tr. 222, 224.) She also stated that her pain was so severe that she was forced to miss one day of work. (Tr. 224.) An exam noted her lumbar ROM had flexion of thirty degrees, extension of ten degrees, right and left sidebending at ten degrees, right and left rotation of thirty degrees, and straight

leg raises of ninety degrees on both sides.  (Tr. 224-25.)  She was ordered to continue physical therapy, and had continued lifting restrictions of ten pounds.  (Tr. 225.)  As of February 19, she had missed two out of three physical therapy sessions.  (Tr. 209.)

Her second follow-up was February 26, 2007.  Anthony began reporting pain in her right shoulder, but it was not mentioned in the initial accident report.  (Tr. 206.)  Her lumbar ROM had improved, with flexion increasing to forty degrees, extension increasing to twenty degrees, right and left sidebending increasing to thirty degrees, and other ROMs staying the same. (Tr. 210-11.)  However, she still had high "subjective complaints," and was referred to Dr. Sandra Tate for further treatment. (Tr. 206.)

On March 1, 2007, Anthony was examined by Dr. Tate, who opined Anthony's symptoms were the result of her February 6 fall.  Dr. Tate recommended Anthony undergo physical therapy for right SI[2] dysfunction. During that visit, Dr. Tate noted her gait was normal, she was able to walk with no specific defects, and her range of motion was at eighty percent normal.  Dr. Tate opined that Anthony should work with restrictions of lifting no more than ten pounds, but believed she would be at "maximal medical improvement" in approximately four weeks.  (Tr. 260-61.)

On March 7, 2007, Dr. Tate conducted a follow-up examination. Anthony reported she began physical therapy again two days prior, but felt it was not helping.  Dr. Tate noted Anthony no longer evidenced pelvic asymmetry, Anthony's pain was "out of proportion to objective findings," and she believed Anthony could work with restrictions of lifting no more than thirty pounds.  Dr. Tate also felt that if the MRI was negative Anthony could work without restrictions. (Tr. 256-57.)

On March 20, 2007, Dr. Tate noted an MRI conducted on March 13 found only degenerative changes in the spine.  Anthony's straight leg raising was negative to ninety degrees in both the sitting and lying positions, and her thoracolumbar range of motion remained at eighty percent normal. Dr. Tate opined that  Anthony had "greater subjective complaints than

---

[2]SI dysfunction, or sacroiliac joint dysfunction, is a condition that causes pain in the sacroiliac joints.  WebMD, http://www.answers.webmd.com (last visited March 19, 2012).

objective findings," concluded that Anthony could return to work without restrictions, and that she was at maximum medical improvement. (Tr. 254-55.)

During her visits to Dr. Tate, Anthony was involved in physical therapy during the month of March 2007, and was discharged on March 22. Despite telling Dr. Tate the therapy was not helping, the discharge sheet noted several improvements. Her lumbar ROM when initially entering the March therapy had some improvements from February, with flexion and extension remaining at forty degrees and twenty degrees respectively. The right and left rotation increased to fifty degrees. However, the right and left sidebending decreased to twenty degrees, and upon discharge from the March physical therapy, flexion improved to between fifty and sixty degrees. Her gait upon discharge was "much improved" and her balance again improved from fair to good. When she began therapy she reported pain of 10/10. But upon discharge she rated her pain at 4/10. Her extremity strength remained 4/5 in all areas throughout the March 2007 therapy. (Tr. 278.)

On April 27 2007, Anthony's employer fired her, stating she was late to work. (Tr. 137.)

On May 12, 2007, Dr. Dwight Woiteshek examined Anthony. He noted that she had lumbar flexion of forty-five degrees where sixty degrees is normal, had lumbar extension of fifteen degrees where twenty-five degrees is normal, and left and right lateral bending of fifteen degrees where twenty five is normal. Her straight leg raising was positive on the right to thirty degrees, and on the left it was positive to sixty degrees. Dr. Woiteshek diagnosed Anthony with chronic low back strain and concluded that Anthony had "permanent partial disability of 15% whole person." However, he described Anthony as having sustained maximum medical improvement and her gait as normal. The strength of all lower muscles was 5/5. (Tr. 294-96, 312.)

Anthony next visited Dr. Kim McDonald during November and December of 2007 for severe back pain and high blood pressure. Dr. McDonald first saw Anthony on November 12, 2007, and noted Anthony possibly had Degenerative Joint Disease (DJD) of L2-3, L3-4, and L4-5 based on an examination of an MRI. (Tr. 306) Dr. McDonald saw Anthony again on

November 26, 2007 for continued back pain, and observed Anthony had a decreased ROM due to pain, but did not record any specific measurements similar to those of Dr. Tate, Dr. Woiteshek, or Barnes Care. There was again an indication of DJD based on a review of an MRI. (Tr. 304.) On December 28, 2007, Dr. McDonald again noted a decrease in Anthony's ROM, but again did not give any specific measurements. (Tr. 301.)

On December 31, 2007, Anthony filed for Social Security Disability benefits. (Tr. 135.) In her application, she stated pain was the primary reason preventing her from working, describing "back [pain] (upper + lower) . . . severe pain, fatigue, leg pain, arms and wrists hurt (carpal tunnel in both hands) . . . body aches all over, headaches, pressure up, weakness, Bump into walls or get off balance, stress + depression." (Tr. 156.) Anthony described her six employments: a cook at Abbey Care Center from April 2004 to April 2007; a cook and cashier at Children's Hospital from February 2001 to February 2002; a stadium food attendant and bartender from April 1998 to August 2003; a cake wrapper and packer from May 1981 to October 1990; a packer from September 1994 to July 1996; and a dietary aide from August 1992 to August 1994. (Tr. 145, 164.) As a cook at Abbey Care Center, she used a mixer and meat slicer. Although Anthony reported that she lifted fifty pounds frequently and twenty pounds occasionally, it appears she meant to state that she lifted twenty pounds frequently and fifty pounds occasionally. Anthony stated that the lifting involved carrying frozen meat from the walk-in freezer to the sink or cooking table. (Tr. 165.) For her other five previous employments, Anthony reported she lifted at the most and frequently ten pounds or less. (Tr. 166-70.)

Dr. McDonald saw Anthony on January 5, 2008 for problems in her hands and wrists, and also noted Anthony had similar problems before. (Tr. 376.) On February 20, 2008, Dr. McDonald received correspondence from the Northlands Mid America Orthopedics. It noted that Anthony wanted an opinion about her back. She was examined for both her back injury and for tingling and numbness in her hands. (Tr. 364.) The examination report noted flexion was thirty degrees, extension was fifteen degrees, right and left rotation were twenty degrees each, she was able to stand on her heels and toes, and her straight leg raise was

negative bilaterally. Tinel[3] testing over the carpal tunnels was negative bilaterally, Phalen[4] testing on the right hand was negative but on the left Anthony reported some numbness, and Finkelstien[5] testing on the left was mildly positive. The diagnosis for her back was low back pain with degenerative disc disease. The doctor stated Anthony might have carpal tunnel condition in both hands and De Quervain's tenosynovitis. Although an EMG was ordered, Dr. McDonald reported on February 25 that the EMG was not completed because it was "too painful." (Tr. 363, 374.)

On March 4, 2008, Anthony's physical residual functional capacity (RFC) was assessed by an SSA assessor. (Tr. 318.) The assessment was based on the medical reports of Dr. Tate, Dr. McDonald, Dr. Woiteshek, Barnes Care, DePaul Health Center, and St. Louis Orthopedic Institute. (Tr. 69.) The assessor found that although Anthony made several complaints of pain, she was not attending physical therapy despite reporting she could drive, and on this basis found Anthony's symptoms were only partially credible. The assessor also noted Dr. Tate's finding of no work restrictions. (Tr. 318.) The assessor gave Anthony a light RFC rating, concluded she could return to work, and recommended a denial of benefits. (Tr. 68.)

On March 12, 2008, Anthony saw Dr. Rachel Feinberg for back and wrist pain. Anthony reported doing physical therapy from December 2007

_____

[3]Tinel's: During a Tinel's sign test, the patient's doctor taps on the inside of the patient's wrist over the median nerve. If the patient feels tingling, numbness, "pins and needles," or a mild "electrical shock" sensation in his hand when tapped on the wrist, he may have carpel tunnel syndrome. WebMD, http://www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome (last visited April 2, 2012).

[4]Phalen's: During a Phalen's sign test, the patient rests his elbows on a flat surface, such as a desk, with his elbows bent and his forearms up. He then flexes his wrists, letting his hands hang down for about 60 seconds. If the patient feels tingling, numbness, or pain in the fingers within 60 seconds, eh may have carpal tunnel syndrome. WebMD, http://www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome (last visited April 2, 2012).

[5]Finkelstein: Finkelstein's test is used to confirm a diagnosis of de Quervain's tenosynovitis, a condition brought on by irritation or inflammation of the wrist tendons at the base of the thumb. Mayo Clinic, http://www.mayoclinic.com/health/medical/IM00780 (last visited April 2, 2012).

to January 2008, but that it did not help.[6]   On her examination of
Anthony's spine, Dr. Feinberg noted the thoracic spine showed significant
signs of thoracic spondylolysis,[7] but also noted the lateral view of the
lumbar spine did not show any bone spurs that precluded mobilization of
the spine.   Anthony had "torque and side bend and [rotation] at L1, L2,
L3, and L4." An x-ray showed that Anthony maintained her disc height.
Anthony's ROM of the cervical spine had "50% loss of rotation in both
right and left."   (Tr. 385)   Dr. Feinberg opined that Anthony needed
extensive manual therapy.   (Tr. 386)

Dr. Feinberg saw Anthony again for her back pain on May 6, 2008, and
an examination revealed that her thoracic spine was fixed and not moving.
Dr. Feinberg restarted Anthony on "thoracic bolster exercises," and
opined that Anthony would be well served by an "iliopsoas compartment
block to decrease neurotension and an injection of the thoracic spine to
facilitate mobilization."   (Tr. 382.)

On May 15, 2008, Dr. Feinberg gave Anthony a dorsal median nerve
root injection.   Anthony was scheduled for additional physical therapy.
(Tr. 381-86.)

On July 1, 2008, Anthony settled her worker's compensation claim
against her employer for the February 6, 2007 accident. (Tr. 190.)

On August 12, 2008, Anthony was examined again at Northlands Mid
America Orthopedics for wrist pains.   Her sensation was intact to light
touch, and she had no thenar,[8] hypothenar,[9] or interosseous[10] wasting.[11]
Anthony also had a negative Tinel's at the wrist, a negative Phalen's,

---

[6]The record does not contain any medical notes for these physical
therapy visits.
[7]Spondylolysis is the degeneration or deficient development of a
portion of the vertebra.   Stedman's Medical Dictionary 1813 (28th ed.
2006).
[8]Thenar refers to the fleshy mass on the lateral side of the palm
at the base of the thumb.   Stedman's at 630, 1970.
[9]Hypothenar refers to the fleshy mass at the medial side of the
palm.   Stedman's at 630, 937.
[10]Interosseous refers to certain muscles and ligaments between or
connecting bones.   Stedman's at 990.
[11]Wasting is a disease characterized by emaciation.   Stedman's at
2146.

and a positive Finkelstien.  She had no warmth, no erythema,[12] and no effusion.[13]  She was diagnosed with de Quervain's tenosynovitis with underlying arthritis, and it was determined she did not have carpal tunnel.  She was recommended to undergo surgical decompression to alleviate the pain and to stop smoking to prevent further worsening her wrist problems.  (Tr. 362.)

On August 27, 2008, Anthony underwent surgery performed by Dr. Belew for the pain in her hands.  (Tr. 369.)  Dr. Belew noted a mass on her left hand and drained fluid from it.  (Tr. 363.)  Anthony "tolerated the procedure well."  (Tr. 418.)

On September 18, 2008, Anthony underwent an MRI, which noted a partial tear of the supraspinatus[14] tendon.  (Tr. 367.)

On September 29, 2008, Dr. Feinberg completed an RFC assessment of Anthony based on her contacts with Anthony from March 12 to May 15, 2008. Dr. Feinberg reported Anthony could only sit for forty-five minutes at a time and stand for five minutes at a time.  Dr. Feinberg opined that Anthony's conditions would occasionally interfere with her workday and during a full workday Anthony could only sit, stand, and walk for less than two hours.  Anthony would need four to five unscheduled breaks a day for fifteen minutes each, and Anthony could rarely look down, turn her head left or right, look up, and could occasionally hold her head in a static position.  Dr. Feinberg also opined that Anthony could rarely lift up to ten pounds, could never lift ten pounds or more, could not twist, crouch/squat, or climb ladders, and could only rarely stoop and climb stairs.  (Tr. 377-80.)

On October 21, 2008, Dr. McDonald received correspondence from Dr. Belew, indicating Anthony had underlying shoulder-hand syndrome.[15]  (Tr.

---

[12]Erythema refers to redness due to capillary dilation, usually signaling a pathologic condition (e.g., inflammation, infection). Stedman's at 666.
[13]Effusion refers to the escape of fluid from the blood vessels or lymphatics into the tissues or a cavity.  Stedman's at 616.
[14]Supraspinatus is a rotator cuff muscle that initiates abduction of the arm.  Stedman's at 1255.
[15]Shoulder-hand syndrome, or complex regional pain syndrome, is a chronic pain condition that results from damage to the nervous system, including the nerves that control the blood vessels and sweat glands. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004456 (last (continued...)

441.)  On October 29, 2008, Anthony underwent surgery for a torn right rotator cuff.  Dr. Belew repaired the tear, inserted a pain pump, and then closed the surgical area.  (Tr. 420.)

After the surgery, Anthony was advised to engage in physical therapy on November 8, 2008.  An overhead trapeze was provided for home exercises.  Notes from December 11, 2008 indicate, however, that although the therapist recommended continued therapy, Anthony only attended twice a week.  While Anthony did not have full overhead range and had significant weakness in the rotator cuff, she made gradual improvements.  Anthony's therapy was extended, but the notes indicated a desire for Anthony to "work aggressively on her cuff rehab program."  (Tr. 442.)

On February 7, 2009, Dr. Belew completed an RFC review of Anthony.  Dr. Belew indicated Anthony's diagnosis was a rotator cuff tear, with pain in the shoulder.  He noted that the October 29, 2008 surgery was for this condition.  Dr. Belew opined that occasionally her pain interfered with her attention and concentration in the workplace, but indicated Anthony could sit and stand for more than two hours at a time, and could sit and stand during a standard work day for at least six hours.  Dr. Belew also stated that Anthony did not need to take unscheduled work breaks, did not need a cane, and could frequently look down, turn her head left and right, look up, hold her head in a static position, twist, stoop, crouch, and climb stairs.  However, he indicated that she could occasionally lift up to ten pounds and rarely lift ten pounds or more.  Dr. Belew also indicated Anthony had an overhead limitation, and would likely be absent from work for more than four days a month. (Tr. 403-06.)

On March 2, 2009, Dr. McDonald saw Anthony for frequent urination.  However, Dr. McDonald also noted although Anthony was conducting some physical therapy exercises at home, she had stopped going to professional physical therapy for her right shoulder.  Dr. McDonald also noted Anthony was caring for her 29 month old granddaughter.  (Tr. 440.)

**Records Submitted Directly to the Appeals Council**[16]

---

[15](...continued)
visited March 19, 2012).
    [16]These records are dated after the ALJ's decision and were not considered in this appeal, but they are presented to give a complete view
(continued...)

On November 9, 2010, Anthony was examined by Dr. Rafat Nashed regarding her right shoulder. (Tr. 11.) Anthony reported having a popping of her shoulder in 2007, stating it was slipping out of the socket. She also recounted that she had the rotator cuff surgery in October 2008, and had a pain pump afterward to deal with the pain, but it was recalled. Although she went to physical therapy, she said it hurt even more. Anthony reported she could not lift pens or open jars. Although she had two carpal tunnel release procedures, in 2006 and 2008, one for each hand, her hands did not get better. Anthony also reported poor balance. Dr. Nashed noted an examination of the shoulder indicated a 0 to 160 degrees of elevation, seventy degrees of external rotation and internal rotation to L2. Dr. Nashad also noted there was no narrowing of the subacromial joint, degenerative joint disease, or avascular necrosis. Dr. Nashed recommended an MRI for an evaluation of the rotator cuff tear, and a followup in seven to ten days. (Tr. 11.)

On November 19, Anthony saw Dr. Nashed again. Anthony reported again that she had pain in her shoulder since Dr. Belew's 2008 surgery. Dr. Nashed's examination showed no degenerative joint disease, but the MRI showed a potential rotator cuff tear for the right shoulder. Anthony demonstrated 0 to 160 degrees of passive elevation, 0 to 140 degrees of active elevation, and significant crepitus. Anthony's back also showed L3-L4 moderate left side stenosis. (Tr. 13.)

On December 10, 2010, Dr. Nashed saw Anthony again. He noted an MRI report of the lumbar spine dated August 9, 2010. It showed the L4-L5 disc herniation and moderate left recess stenosis at L2-L3 and L3-L4. Anthony stated she was doing better after the injection on November 19, 2010. Regarding her shoulder, Dr. Nashed's impression was Anthony's current problem was a recurrent rotator cuff tear, and recommended a second rotator cuff repair. Anthony understood the risks and elected to proceed with the surgery. (Tr. 14.)

On January 4, 2011, Anthony underwent another rotator cuff repair. (Tr. 15.) Dr. Nashed repaired the recurrent tear, and "[g]ood repair was achieved." Dr. Nashed noted Anthony was tolerating the procedure and

---

[16](...continued)
of the record. For discussion on why the newer medical records were not considered, see infra at 18-19.

post-surgery therapy well.  (Tr. 7, 16.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on August 30, 2009.  (Tr. 32-50.)  Anthony was the sole witness. She testified to the following.

Anthony is the caretaker for her husband and son. Although she does not have a GED or vocational training, she has prior experience as a cook.  (Tr. 35-36.)  During the third and fourth quarter 2007 she collected unemployment, settled her workman's compensation claim in mid 2008, and attended physical therapy, but had no vocational training since her injury.  (Tr. 36-37.)  Although Anthony was arrested for a DWI she did not participate in detox or rehabilitation for that incident, and was in the process of reinstating her driver's license.  Her symptoms keep her from returning to work.  (Tr. 38.)  She also has not seen Dr. Feinberg since 2008, claiming there is "[n]othing else she can do for me." (Tr. 39.) Dr. Belew conducted surgery on her right arm, but has not seen him since 2008 because he had stopped seeing patients.  (Tr. 40.)  The ALJ noted that although the records indicated that Dr. Belew had seen Anthony last in 2008, he had completed an assessment in February 2009. However, Anthony stated that she had seen him once more in January 2009 to gather her paperwork from him.  (Tr. 41-42.)

Anthony did not currently drive, but claimed she could.  (Tr. 43.) She cannot walk for more than five minutes, with her balance being the main limiting factor.  (Tr. 43.)  She is also unable to stand in place for more than two minutes with balance again being the limiting factor. She stated she cannot sit for more than ten minutes before "constant pain" begins in her lower back.  (Tr. 44.)  She has had pain and numbness in her right arm after Dr. Belew's surgery and also trouble opening containers and picking things up.  (Tr. 45.)  She cannot raise her right hand above her head or lift five pounds.  (Tr. 45-46.)  She has had difficulty sitting in a tub, bathing, and dressing herself. Her husband assisted her with those activities.  (Tr. 46.)  She takes Vallium for sleeping and for pain.  (Tr. 47-48.)

**Post Hearing Addendum**

After the hearing, the ALJ concluded with a post-hearing addendum and noted several concerns. The ALJ observed several inconsistencies during Anthony's testimony, with Anthony changing her position on several issues and often giving "construed" answers. (Tr. 48.) Although Anthony claimed she could not sit for more than ten minutes at a time, the ALJ noted that she sat during the hearing from 12:05 to 12:31 without shifting in her seat or showing any discomfort. The ALJ also noted that when Anthony raised her arm to show she could not lift her arm over her head, that she indeed lifted her arm over her head. (Tr. 49.) In addition, Anthony had received unemployment during 2007, indicating a capacity and willingness to work, and the ALJ observed that until shortly before the hearing Anthony stopped seeking follow-up treatment for her back injuries. (Tr. 49-50.)

### III. DECISION OF THE ALJ

On November 10, 2009, the ALJ entered an unfavorable decision. (Tr. 21-26.) At Step One, the ALJ found that since April 27, 2007, Anthony did not engage in any substantial gainful activity. (Tr. 23.) At Step Two, Anthony had the severe impairment of degenerative disc disease. The ALJ dismissed the claim that Anthony had carpal tunnel because the record lacked supporting evidence. She dismissed Anthony's right shoulder condition because it did not satisfy the twelve month duration requirement of 20 C.F.R. §§ 404.1509 and 416.909. The medical record showed Anthony made improvements and discontinued physical therapy. Anthony also demonstrated at the hearing she could lift her arm over her head, countering claims of overhead limitations. (Tr. 23-24.) The ALJ found Dr. Belew's February RFC assessment incredible because he had last seen her two months before his assessment, and because Dr. Belew opined that limitations of Anthony's arm affected her sitting and standing ability. The ALJ dismissed the claim of high blood pressure because the medical record did not show severity. (Tr. 24.)

At Step Three, the ALJ found that Anthony's degenerative disc disease did not meet or medically equal a listing in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.296, because Anthony did not exhibit motor loss among other things. (Id.)

When the ALJ assessed Anthony's RFC, she found Anthony could lift fifty pounds occasionally, lift twenty-five pounds frequently, sit six hours in an eight hour day, stand and/or walk a total of six hours in an eight hour day, which constituted a full range of medium work. (Tr. 24.)

The ALJ noted the early 2007 examinations immediately after her fall only showed degeneration, and that Dr. Tate reported Anthony could return to work. (Tr. 24-25.) The ALJ also stated Anthony did not see any treating physicians from April 2007 through October 2007. Although Dr. Woitesheck was a only a consulting physician, he too concluded Anthony could return to work, despite some partial permanent disability and some decreased lumbar ROM. Anthony's November 2007 to February 2008 examinations showed decreased lumbar ROM, yet no other abnormalities were noted and straight leg raises were negative. Although Dr. Feinberg mentioned lumbar limitations, the record was silent from a spinal standpoint after Dr. Feinberg gave Anthony a nerve root injection. (Tr. 25-26.)

The ALJ found Dr. Feinberg's RFC's unpersuasive, because although she found profound limitations in Anthony's ability to work, she based those limitations on one examination and her findings were also inconsistent with the record as a whole. (Id.)

The ALJ also found Anthony lacked credibility. The ALJ noted that Anthony denied doing household activities, but testified she cared for her son and her disabled husband. Although Anthony consistently complained about her pain, the treating physicians noted the reports of her pain were disproportionate to the objective medical findings. Finally, Anthony only stopped working because of her termination at work for lateness and she drew unemployment, indicating an ability to work. (Tr. 26.)

At Step Four, the ALJ found Anthony was able to perform her past relevant work as a cook. The ALJ reasoned that working as a cook did not require more than a medium exertional capacity as performed in the national economy according to DOT 315.361-010. Based on these findings, the ALJ found Anthony was not disabled. (Id.)

## IV. GENERAL LEGAL PRINCIPLES

- 13 -

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." <u>Id.</u> In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. <u>Id.</u> As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. <u>See</u> <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); <u>Pate-Fires</u>, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4); <u>see</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987) (describing the five-step process); <u>Pate-Fires</u>, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. <u>Pate-Fires</u>, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. <u>Id.</u> Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). <u>Id.</u> The claimant bears the burden of demonstrating she is no longer able to return to her PRW. <u>Id.</u> If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. <u>Id.</u>

## V. DISCUSSION

Anthony argues that the ALJ erred by rejecting the opinions of her treating physicians, Dr. Feinberg and Dr. Belew. Anthony also argues without those medical opinions, the ALJ's decision is not supported by "some" medical evidence as required by Singh[17] and Lauer[18] because the opinions of Dr. Feinberg and Dr. Belew contained the only medical evidence about Anthony's lifting capacity to determine her RFC. Finally, Anthony also challenges the ALJ's Step Four analysis as underdeveloped and conclusory, and thus improper under Pfitzner.[19] (R. 14-16.)

**A.  The Opinions of Dr. Feinberg and Dr. Belew**

When a treating physician's opinion is supported by the record, it is accorded substantial weight. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008). However, a treating physician's opinion is not conclusive, because the claimant's RFC must be assessed from the record evaluated as a whole. Id. The record is also evaluated as a whole "to determine whether the treating physician's opinion should control." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009). "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Id. (quoting 20 C.F.R. § 404.1527(d)(2)). When "a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002). The ALJ is responsible for resolving conflicts in the record. Finch, 547 F.3d at 936.

**1.  Dr. Feinberg**

In her RFC assessment, Dr. Feinberg opined that Anthony could only lift up to ten pounds rarely and never lift more than ten pounds. (Tr. 379.) The ALJ's rejected Dr. Feinberg's RFC finding because it was based on only one examination and was inconsistent with the remainder of the medical record. (Tr. 25-26.) The undersigned agrees.

---

[17]Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000).
[18]Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).
[19]Pfitzner v. Apfel, 169 F.3d 566, 568-69 (8th Cir. 1999).

First, Dr. Feinberg's examination of Anthony showed severe, continued problems. (Tr. 381-86.) In contrast, Dr. Tate's three examinations during March 2007 initially showed problems, but then showed consistent, improving results and maximal medical improvement when Anthony attended therapy. (Tr. 255.) Further, Dr. Woiteshek found medical results similar to Dr. Tate's, specifically that Anthony had lumbar ROMs in May 2007 similar to that of March 2007, and her spine exhibited only degeneration. (Tr. 262, 278, 295-96.) Dr. Woiteshek also concluded Anthony had achieved maximal medical improvement and did not order any particular limitations of Anthony's activities. (Tr. 295-96.)

Dr. Feinberg and Dr. Tate came to opposite conclusions about Anthony's capacity to function despite noting similar medical conditions. A mere month and a half after Anthony's fall, Dr. Tate opined that Anthony could return to work without restrictions and during treatment cleared her to lift at least thirty pounds. (Tr. 254.) Dr. Feinberg concluded, however, that Anthony was unable to lift more than ten pounds, could not twist or crouch, and could not stand more than five minutes at a time. (Tr. 378.)

Based on the foregoing, substantial evidence supports the ALJ's decision to reject Dr. Feinberg's RFC assessment. That a medical opinion is inconsistent with other portions of the record is a proper reason to discount it. Hilkemeyer v. Barnhart, 380 F.3d 441, 445-46 (8th Cir. 2004) (holding inconsistencies between a physician's opinion and the medical record is a proper basis for rejecting a treating physician's opinion).

### 2. Dr. Belew

In his RFC assessment, Dr. Belew opined Anthony could lift up to ten pounds occasionally and ten pounds or more rarely. (Tr. 405.) However, Dr. Belew's RFC is only relevant to Anthony's rotator cuff. (Tr. 403-06.) At Step Two, the ALJ found Anthony's rotator cuff condition was not a severe impairment, discarded Dr. Belew's RFC assessment, and did not discuss that assessment in her analysis of Anthony's RFC. (Tr. 23-26).

If an impairment fails the durational requirement at Step 2, then the ALJ does not continue considering it during the remainder of the

disability analysis because the claimant is not disabled in that respect. 20 C.F.R. § 404.1520(a)(4); see Rose v. Apfel, 181 F.3d 943, 945 (8th. Cir 1999) (affirming the ALJ's disability analysis that did not consider the mental problems of the claimant in Step 4 after the ALJ determined in Step 2 the mental problems were not a severe impairment); Martise v. Astrue, 641 F.3d 909, 923-24 (8th Cir. 2011) (affirming the ALJ's RFC assessment which did not consider an alleged impairment because that impairment was not severe, and because it did not meet the durational requirement); see also Troupe v. Barnhart, 32 F. App'x. 783, 785 (8th Cir. 2002) (affirming an RFC discussing less conditions than what the claimant's doctors discussed because those other conditions did not last twelve months); Hollingshead v. Astrue, 2011 WL 3626419, *12 (E.D. Mo. 2011) (affirming the ALJ's RFC assessment which did not consider the claimant's lower right dysfunction and hypertension because they did not meet the durational requirement).

Substantial evidence supports the ALJ's decision that the medical record did not indicate that Anthony's rotator cuff injury would last for more than twelve months. The ALJ noted that Anthony had stopped attending therapy for her arm by March 2009, despite the therapy showing improvements in her rotator cuff. (Tr. 23, 440, 442.) A treatable condition is not disabling. Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).

The ALJ also noted that the medical record is silent from March to October 2009; and Anthony sought treatment for her arm from October 2009 to February 2010. (Tr. 24.) Gaps in the medical record can indicate a lack of a continuous twelve month duration. Martise, 641 F.3d at 923. Further, Anthony showed at the hearing her ability to lift her arm above her head. (Tr. 49.) A claimant's behavior at the ALJ hearing is relevant to whether her disability is supported by the medical record. Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001).

Because there were sufficient reasons to find that Anthony's rotator cuff did not meet the twelve month durational requirement, the ALJ did not err in not accepting Dr. Belew's opinion about Anthony's ability to lift in the RFC analysis.

### 3.  Medical Records Submitted Directly to the Appeals Council

Anthony submitted documents to the Appeals Council after the date of the ALJ's decision to attempt to show an ongoing problem in her rotator cuff since her 2008 surgery. The Appeals Council will consider new and material evidence only when "it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). Records are material if they are "relevant to claimant's condition for the time period for which benefits were denied." Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000). If the documents exhibit a new condition or disability on a date after the ALJ's decision, the Appeals Council cannot consider them. Roberson v. Astrue, 481 F.3d 1020, 1026 (8th Cir. 2008).

Although the Appeals Council examined the documents, it did not consider them when denying review because the documents related to a period of time after the ALJ's decision. (Tr. 2.) Anthony argues the medical records are relevant because they show she was unable to use her right arm since her surgery in October 2008 and up to the period leading to the ALJ's decision.

First, Anthony cites to the new medical documents to argue she had a continuing injury after her October 2008 rotator cuff surgery. However, the only evidence of this in the new documents was a summary of Anthony self-reporting her medical history to her new examining physician. This document does not indicate that Dr. Nashed had reviewed Anthony's medical history. Further, Dr. Nashed's evaluation was non-conclusive and he recommended an MRI for Anthony's arm and spine. (Tr. 11.)

The medical records submitted indicate any problems currently with her arm are the result of a re-tear of her rotator cuff since the October 2008 surgery, and not the persistence of the original rotator cuff injury.  Dr. Nashed noted the surgery he conducted was for a recurrent rotator cuff tear, and, during the surgery he described, he fixed a tear occurring at the original site of Dr. Belew's 2008 surgery. (Tr. 10, 15-16.)  Nothing in this record indicated any problems arising from the initial repair of her rotator cuff in October 2008 to the ALJ's November 2009 decision. (Tr. 420-21.)  Further, a twenty month gap exists in the

medical record from the last available medical document in March 2009 and the MRI showing a new tear in November 2010. (Tr. 14, 440.)

Thus, the medical records submitted directly to the Appeals Council appear to relate only to the time after the ALJ's decision. See Bergman v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000). (holding medical records must relate to the time period for which benefits were denied). Therefore the Appeals Council properly refused to consider the post-decision medical records.

In sum, the ALJ properly discounted Dr. Feinberg's RFC opinion because it was inconsistent with other portions of the medical record. The ALJ also properly did not consider Dr. Belew's RFC because it only related to Anthony's arm, which the ALJ found not to have a severe impairment under Step Two, and thus not relevant to her RFC. Finally, the records submitted to the Appeals Council did not relate to the period before the ALJ's decision and therefore cannot be considered.

Therefore, the undersigned concludes that the post-hearing records are not relevant to the consideration of Anthony's RFC.

## B. Medical Evidence Supporting the RFC

The ALJ's determination of the RFC must be supported by substantial medical evidence on the record. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir.2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir.2000). RFC is what the claimant can do, in spite of her limitations, and is determined on the basis of all relevant medical evidence, "including medical records, physician's opinions, and claimant's description of her limitations." Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 416.945(a). RFC determinations are not restricted to medical evidence, but the ALJ must consider "some" medical evidence by a medical professional. Lauer, 245 F.3d at 704.

Although the ALJ eliminated the only medical evidence giving a numerically expressed value to what Anthony could lift, other medical evidence properly supported her RFC determination. In Flynn v. Astrue,[20] the medical record had both quantitative and qualitative assessment's of Flynn's ability to function. Flynn v. Astrue, 513 F.3d 788, 789-90 (8th

---
[20]Flynn v. Astrue, 513 F.3d 788 (8th Cir. 2008).

Cir. 2008). The quantitative assessments indicated that Flynn could only lift ten pounds occasionally and lift less than ten pounds frequently, but were both internally and externally inconsistent. Id.

The qualitative assessment of Flynn's RFC, however, indicated good muscle strength and mobility when initially diagnosed with fibromyalgia. Id. at 789. Treating physicians years later noted she had "full muscle strength," and continued to find Flynn had normal muscle strength. Id. at 789-90. Relying on the those qualitative assessments, the ALJ found the claimant could lift twenty pounds occasionally and ten pounds frequently. Id. at 794. The Eight Circuit affirmed, holding that the physician's reports about the claimant's general muscle strength sufficiently supported the ALJ's RFC findings. Id. at 794-75.

Here, the medical evidence was similarly sufficient for the ALJ to find Anthony retained an RFC to perform medium work. The ALJ afforded significant weight to the opinions of Dr. Tate and Dr. Woiteshek. (Tr. 25-26.) Although neither Dr. Tate or Dr. Wotieshek specifically indicated Anthony could lift twenty-five pounds frequently and fifty pounds occasionally, their opinions were consistent with one another, despite being conducted in different months by different doctors following the slip and fall. (Tr. 254-261, 295-96.) Both indicated Anthony was at maximal medical improvement at the time of their examinations. (Tr. 255, 296.)

During March 2007, Anthony had a nearly normal lumbar ROM, and although it decreased slightly by the time she saw Dr. Woiteshek, it was still consistent with the March 2007 numbers. (Tr. 278, 295-96.) Dr. Tate had cleared Anthony to lift up to thirty pounds before Anthony concluded her March 2007 physical therapy and only a month after her fall. (Tr. 257.) At the conclusion of Anthony's therapy, and after viewing the March 2007 MRI, Dr. Tate cleared Anthony to return to work with no restrictions. (Tr. 255.)

Both Dr. Tate and Dr. Woiteshek found only degenerative changes in her spine, despite her fall. (Tr. 255, 296.) Although Dr. Woiteshek found Anthony had some lasting back problems, he did not conclude Anthony was unable to continue working and did not impose any limitations. (Tr. 296.) Dr. Tate found that Anthony's subjective complaints were not

supported by the objective medical evidence, which was also noted a month earlier by the physicians at Barnes Care. (Tr. 206, 255.) In sum, there was substantial medical evidence for the ALJ to find Anthony could lift fifty pounds occasionally and twenty-five pounds frequently.

Other medical evidence also supported the ALJ's RFC determination. The ALJ noted both that Anthony ceased lumbar treatments after May 2008, and that the record was silent about her back after her worker's compensation settlement. (Tr. 24, 26.) Anthony frequently stopped physical therapy against the advice of her doctors. At the hearing Anthony stated that her reason for discontinuing treatment for her back from Dr. Feinberg was because "[there is] nothing else [Dr. Feinberg] can do for me." (Tr. 39.) The medical records suggest, however, she made consistent improvements while undergoing physical therapy. (Tr. 209, 218, 252-62, 278.) Anthony's gait was normal during multiple examinations and her lumbar ROM consistently improved after physical therapy, but fell after periods of not attending physical therapy. (Id.) During Dr. Woiteshek's examination, he compared normal lumbar ROM ranges to Anthony's lumbar ROM. At the height of Anthony's physical therapy in March 2007, her lumbar ROM upon discharge was nearly at the normal ranges listed by Dr. Woiteshek. (Tr. 278, 295-96.) A treatable condition is not disabling. Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993). Anthony frequently did not attend physical therapy or missed therapy visits. (Tr. 209, 218, 440.) "Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).

Further, the ALJ pointed to other non-medical evidence that corroborated the medical evidence and diminished Anthony's credibility. Anthony only stopped working because she was fired for lateness, and not because of her physical inability to work.[21] (Tr. 137.) Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992) (finding significant that the claimant worked until the closing of a shoe plant, and did not stop

---

[21]The record indicates that immediately after the fall and before any physical therapy, Anthony was working full duty as a cook, and only missed one day of work. (Tr. 206.) In fact, Anthony did not list her onset of disability the date of her fall, but instead as the date she was fired. (Tr. 137.)

working because of her impairments).  Further, Anthony cared for family members, including her twenty-nine month old granddaughter and her disabled husband.  (Tr. 36, 442.)  <u>See</u> <u>Buckner v. Astrue</u>, 646 F.3d 549, 558 (8th Cir. 2011) (holding, among other factors, it was significant that the claimant was caring for other family members).

Both Dr. Woiteshek and Dr. Tate found Anthony at maximal medical improvement.  In sum, the ALJ had sufficient medical evidence from the opinions of Dr. Tate and Dr. Woiteshek to find Anthony could lift twenty five pounds frequently and fifty pounds occasionally.  Therefore, the medical evidence sufficiently supported the ALJ's RFC assessment that Anthony could do medium work.

## C.  Step Four

When assessing whether a claimant can return to her previous relevant work, the ALJ must describe the claimant's mental and physical limitations, and determine how those limitations affect her RFC. <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 568 (8th Cir. 1999).  Then, the ALJ must make findings of the mental and physical demands of the previous work. <u>Id</u>.  However, this latter duty may be discharged by reference to specific job descriptions in the Dictionary of Occupational Titles (DOT).  <u>Sells v. Shalala</u>, 48 F.3d 1044, 1047 (8th Cir. 1995).  Even if the ALJ commits error in the Step Four analysis, remand is inappropriate absent unfairness or prejudice.  <u>Samons v. Astrue</u>, 497 F.3d 813, 821 (8th Cir. 2007).

Anthony first argues the ALJ did not consider the limitations of her arm in Step Four.  However, as discussed above, the ALJ did not find her rotator cuff condition was a severe impairment and ended her analysis of it at Step Two.  Under the regulations, when the ALJ determines an impairment is not disabling at any step of the disability analysis, the analysis ends at that point.  20 CFR § 404.1520(a)(4).  Therefore, the ALJ was not required to consider any limitations from Anthony's arm at Step Four.[22]

Anthony's second argument, that the ALJ erred in not considering the mental demands of her previous work as required by <u>Pfitzner</u>, is also

_____

[22]Anthony does not challenge the ALJ's Step Two findings.

unavailing.  Under _Pfitzner_, an ALJ can discharge the requirement to consider **both** the mental and physical challenges of a claimant's previous work by citing the DOT manual.  _Pfitzner_, 169 F.3d at 569.  Further, Anthony does not claim any disability on the basis of a mental impairment, and the ALJ only found a severe physical impairment. (Tr. 23, 38.)  _Cf._, _Rose v. Apfel_, 181 F.3d 943, 945 (8th Cir. 1999) (holding because no severe mental impairment existed, no error occurred when the ALJ did not consider the mental requirements of claimant's past work).  Therefore, the ALJ properly discharged her duty to discuss both the physical and mental limitations of Anthony's past work when she cited the DOT manual.  Thus, there was no error at Step 4 by the ALJ's failing to discuss the mental requirements of Anthony's past work.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.

        /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on June 1, 2012.